In re Adoption of STANLEY DUREN: ALFONSO GUERRY and EVA GUERRY v. SIRENA HICKS, Intervenor, Appellant.—No. 40055.—200 S. W. (2d) 343.

Court en Banc, March 10, 1947.

*L. L. Watts* and *Green & Green* for appellant.

1224

*Samuel C. Hayden* and *Robert S. McKenzie* for respondents.

ELLISON, J.—This case was ordered transferred to this court from the Kansas City Court of Appeals under Sec. 10, Art. V, Const. Mo. 1945, and our Rule 2.06. There are several important issues on the merits, but the first question for our determination is whether the dominant issue is preserved for appellate review on the record and briefs transferred.

The cause originated in the Juvenile Division of the Circuit Court of Jackson County, which sustained the respondents' petition for the adoption of Stanley Duren, an orphan boy eight years old, and decreed accordingly under Sec's 9608-9613,[1] after a favorable

---

[1] All references to our statutes are to R. S. 1939 and to same section numbers in Mo. R. S. A., unless otherwise indicated. All references to our Civil Code are to Sections in Laws Mo. 1943, p. 353 et seq.; and to same decimal numbers following Sec. 847, Mo. R. S. A. (pocket part). Italics and parentheses in quotations are ours unless otherwise stated.

report by a guardian ad litem appointed under Sec. 9612. The intervenor, who had previously been appointed in Douglas County as the boy's guardian, appealed to the Kansas City Court of Appeals, which reversed the decree [195 S. W. (2d) 745] on the ultimate grounds: that under Sec. 9609 the written consent of the intervenor, as guardian, was a condition precedent to a valid adoption; that such consent had not been obtained (which is undisputed); and that the adoption consequently was automatically void.

This legal point was raised for the first time in the Court of Appeals' opinion. It had not been presented to the trial court by either party, nor had it been decided by that court. And neither had the appellant-intervenor raised it in the Court of Appeals. Further, although on such transfers we treat the cause as an original appeal to this court and the intervenor retains her position here as appellant under Rule 2.06, supra, nevertheless she has not filed a new brief but stands on her original brief in the Court of Appeals, which did not raise the foregoing point. However, respondents answered the Court of Appeals' opinion on that issue in their motion for rehearing there (without avail) and have filed another brief in this court in which they take the negative side on that legal question.

And it is also true that the new legal issue depended somewhat on other underlying facts and legal issues, which *were* presented and decided in the trial court and Court of Appeals. The intervenor's answer pleaded the trial court's lack of "jurisdiction over the person or subject matter of this suit." And the questions were mooted: whether the intervenor had previously been legally appointed the boy's guardian by the Probate Court of Douglas County, as claimed by her; whether the respondents could assail in the adoption proceeding the intervenor's earlier appointment as guardian, or whether the appointment was res judicata as a judgment in rem; and whether the juvenile court of Jackson County had jurisdiction of the adoption proceeding under Sec. 9608 if the boy did not then reside in that county, but in Douglas County where his guardian had been appointed.

The Court of Appeals observed [195 S. W. (2d) 1. c. 749(7)] that it felt free to introduce the statutory "consent" issue, because: "The new code and the rules adopted since its passage permit the appellate court some latitude in refusing to dispose of cases upon technical considerations, such as a failure of the appellant to make, in his brief, the precise point governing the case"—citing Sec. 139 of the Civil Code and Rules 1.08, 1.15 and 1.28. It seems to us these citations bear more on the form and manner of taking appeals and writing briefs, and less on the scope of appellate review, than does Sec. 140(a) of the Code, which provides: "Apart from questions of *jurisdiction* of the trial court *over the subject matter* and questions

1226

as to the *sufficiency of pleadings* to state a claim upon which relief can be granted or a legal defense to a claim, no allegations of error shall be considered in any civil appeal *except such as have been presented to or expressly decided by* the trial court."

But other sections of the Code have enlarged the jurisdiction of the appellate courts. Thus, Sec. 114(a) and (d) provides that in all cases tried upon the facts without a jury (of which the instant suit is one) the question of the *sufficiency of the evidence* to support the judgment may be raised for the first time in the appellate court; and that the court must review the case upon both the law and the evidence, but shall not set aside the judgment unless *clearly erroneous.* This last prohibition is stated more broadly in Sec. 123 and in Sec. 140(b), as applying respectively to "the judgment of any court" and to "any judgment." That far the provisions of the Code seem to show more concern for the affirmance of judgments than for their reversal. But Sec. 140(c) goes on: "The appellate court shall examine the *transcript* on appeal (it does not say briefs) and, subject to the provision of subsections (a) and (b) of this section, award a new trial or partial new trial, reverse or affirm the judgment or order of the trial court, or give such judgment as such court ought to have given, as to *the appellate court* shall seem agreeable to law."

In view of these apparently discordant, or at least obscure, provisions of the Code, and under sanction of Sec. 10(a) and (b) thereof, this Court has adopted a supplementing or harmonizing Rule 3.27 which provides: "Plain errors affecting substantial rights may be considered on motion for new trial or on appeal, in the discretion of the court, though not raised in the trial court or preserved for review, or defectively raised and preserved, when the court deems that manifest injustice or miscarriage of justice has resulted therefrom."

We believe the Court of Appeals had the right under that Rule to introduce the "consent" issue into the case. It was a legal capsheaf based on the court's conclusions of law and fact with respect to the issues actually litigated below. We think we may consider that same issue now, since we have been substituted for the Court of Appeals as the appellate court, and especially when it is remembered that respondents' brief here raises the issue negatively. While Sec. 140(a) of the Code, supra, doubtless was enacted in part to shield appellate litigants from surprise, and to protect them from a disposition of the cause on issues not raised below when the litigation was in a formative stage, still it does permit that in the instances specified above, and the disappointed party may always file a motion for rehearing, as respondents did in this case. We are not attempting to say how broadly Rule 3.27 operates; but only that we think it is applicable here.

 Now considering on its merits the "consent" issue first raised by the Court of Appeals and assailed by the respondents. Its opinion

quotes Sec. 9609. As to subject matter, the section is divided into three parts. The first provides, in substance, that the juvenile court shall *not* decree the adoption "except as hereinafter provided," unless the *parents or surviving parent and guardian consent in writing* if the adoptee be less than 21 years old; and if at least 12 years old, the adoptee also must consent in writing. The second part declares the approval of the Court shall be requisite in all cases "such approval being given or withheld as the welfare of the (adoptee) may, in the opinion of the court, demand." And the third part provides that the consent of "a parent" of the adoptee shall *not* be required if "such person" be insane, or under imprisonment for at least two years in futuro, or has wilfully abandoned the adoptee or neglected to provide proper care and maintenance for the two years last past.

Sec. 9610, next following, provides (quoting substantially) that whenever any minor entrusted to the care and custody of any legally incorporated institution in this state for the care and custody of minor children . . . shall have been abandoned by "such parents" for two years, or shall thereafter have been abandoned by them for a like period, the institution may . . . act in the adoption proceedings in the court and consent to the adoption in place of the minor's parents.

And Sec. 9611 provides: "If the written consent herein required is not filed in court, the court shall order notice, by personal service on the parties of the writ of summons and a copy of the petition, or if any such party cannot be found within this state, by a publication . . . (under designated statutes). If, after such notice, a person whose consent is required does not appear, the court may act upon the petition without his consent and the judgment of the court shall be binding upon all persons so served: Provided, any such person shall have the right to appeal from such judgment, . . . "

These three statutes must be construed together. They were all passed as parts of one Act, Laws Mo. 1917, p. 193. As authority on their proper construction, respondents invoked the Child Saving Institute case[2] in their motion for rehearing in the Court of Appeals, and do so here. In its modified, reported opinion [195 S. W. (2d) l. c. 748] the Court of Appeals held that decision was not in point: that it was concerned only with the third part of Sec. 9609, supra, which dispenses with the consent of a *parent* in the instances specified therein and in Sec. 9611; and that it had no bearing on the unconditional requirement of Sec. 9609 that the *guardian* consent.

We are unable to agree with the Court of Appeals interpretation of the Child Saving decision. True, only the rights of a charitable institution (such as designated in Sec. 9610) were involved in that

[2]Child Saving Institute v. Knobel, 327 Mo. 609, 617-8(5, 6), 37 S. W. (2d) 920, 924-5 (9-12), 76 A. L. R. 1068, decided by this court en banc in 1931.

case. But the opinion treated natural parents, guardians and charitable institutions as one general class of "legal custodians", and its conclusions do apply to guardians along with the other custodians. It pointed to the opening lines of Sec. 9609: "The court shall *not* decree the adoption, *except as hereinafter provided,* unless"—written consent of the parent or guardian be obtained. Thence it reasoned that this exceptionary phrase, which the opinion italicised, could be regarded as the controlling provision, and as referring to the requirement of *notice* to the legal custodian if he had not filed written consent to the adoption, thereafter made in Sec. 9611. The conclusion reached by the decision was that these statutes necessitate written "notice in all cases where the legal custodian of the child does *not* consent in writing to the adoption;" but that "a decree of adoption rendered *without* the written consent of *or* notice to the legal custodian of the child, would be binding on the parties to the proceeding and their privies, but would not be binding on the legal custodian who had *no notice* thereof."

There is another decision closely parallel to the instant case in its facts, and directly in point on the immediate question we are considering—the necessity for the consent of a *guardian* in adoption proceedings. It is the Green case,[3] decided by the Springfield Court of Appeals in 1928, over two years before the decision of the Child Saving case just reviewed. But it was not cited in the briefs in that case or mentioned in the opinion. This Green case followed precisely the same line of reasoning and reached the same conclusion as the Child Saving case. And it noted that while Sec. 9609 dispenses with the requirement of consent of a parent if the latter is disqualified as specified therein, yet the right of a guardian to dissent is, on the face of the statute, left entirely unrestricted. Then it continued: "Can it be that the legislature intended to place greater authority in the guardian than in the natural parents? We think not." The decision further pointed to the provisions in both Sec's 9609 and 9613 leaving the ultimate decision to the court, based on the welfare of the child; and declared that if the outcome is dependent entirely on the wishes or caprice of the guardian, the court would become a mere figurehead with no authority or discretion.

We may add that Sec. 9612 adds some weight to this construction of the statute. It requires the juvenile court in such adoption proceedings to appoint a guardian *ad litem* to represent the child. Why would that requirement be made if the child's regular guardian already appointed by the probate court has autocratic control over the proceedings? And further as to regular guardians. It has been

---

[3]Green v. Kellett, 223 Mo. App. 826, 829, 831 (3, 4), 12 S. W. (2d) 523, 535-6 (3, 4). See also McKenzie v. State Board of Control, 197 Minn. 234, 266 N. W. 746, 105 A. L. R. 1460, 1464, Annotation.

said the court appointing guardians is the "superior guardian", and that the guardian himself is deemed to be an officer of the court. The latter is general doctrine.[4] This being true, is it a fair construction of Sec's 9609, 9610 and 9611 to say that an officer of a probate court is vested with power by a mere dissent to nullify adoption proceedings in the juvenile division of a circuit court, which latter is specifically vested by statute with exclusive jurisdiction over adoption proceedings?

The history of the legislation on this subject, reviewed in State v. Damico, 319 Mo. 440, 4 S. W. (2d) 424, forbids such a conclusion. In former years, under Chap. 20, Art. 1, R. S. 1909, the probate court was entrusted with control over adoptions by deed—as to dependent children. And by Laws Mo. 1913, p. 148, it was given the powers of a juvenile court in counties of 50,000 or less. Juvenile courts already existed in counties of greater population. But by Laws Mo. 1917, p. 193, the present Sec's 9608-9616 were adopted, vesting jurisdiction of *all* adoption proceedings in the juvenile division of the circuit court. And on the same day, by Laws Mo. 1917, p. 195, the juvenile courts were established in counties of 50,000 or less and the 1913 Act vesting jurisdiction over (some) adoptions in the probate court was repealed. The two competing jurisdictions cannot stand together. We hold with the Child Saving and Green cases that while the guardian is entitled to notice, and to appear, dissent and defend in the adoption proceeding, yet he cannot control it.

■ The next issue was presented to and adjudicated by both the juvenile court ■ and the Court of Appeals. The juvenile court held the boy resided in Jackson county and decreed the adoption on the theory that it had jurisdiction because of that fact, under Sec. 9608 which requires such suits to be brought in the county where the adoptee resides. The Court of Appeals' opinion ruled this constituted an invalid collateral attack[5] on the previous judgment of the probate court of Douglas county appointing the intervenor as guardian—this on the theory that the circuit court decree challenged the probate court's jurisdiction *ab initio* to make the appointment, since Sec. 378 requires such appointments to be made in the county of the minor's domicile. The opinion further held the probate court's judgment was a judgment in rem conclusive against the whole world; and that it made the question of the boy's residence res judicata,

[4]25 Am. Jur., sec. 2, pp. 7-8; 28 C. J., sec. 12, p. 1062; 39 C. J. S., sec. 1, p. 9; Scott v. Royston, 223 Mo. 568, 609, 123 S. W. 454, 466(10); Cordes v. Coffman (St. L. Ct. App.), 116 S. W. (2d) 207, 209(1).

[5]Citing: 25 Am. Jur., p. 35, sec. 49, and such cases as Johnson v. Beazley, 65 Mo. 250, 264(5), 27 Am. Rep. 276; and Cox v. Boyce, 152 Mo. 576, 581(2), 54 S. W. 467, 75 Am. St. Rep. 483.

regardless of the fact that the respondents were not parties to the probate proceeding and had no notice of it.[6]

We think that ruling was erroneous. No doubt the judgment of the probate court appointing the intervenor as guardian was a judgment in rem. But the res was merely the *status* of the intervenor as a court officer. The proceeding was ex parte and without notice—as Sec. 378 permits, except as against the parents of the minor; and the respondents did not appear or participate therein. In those circumstances, while the probate judgment conclusively established the fact that intervenor was guardian, and the validity of her official acts so far as dependent on that status (as for instance a guardian's deed), yet in the collateral adoption proceeding it was not binding as to its underlying conclusions of fact, including the question of the intervenor's residence. To say that would be to make the judgment *in rem* operate *in personam*. This was expressly held in the Gott case cited by the Court of Appeals.

Furthermore, the adoption proceeding was not an attack upon the intervenor's status as guardian. Sec's 9609, 9610 and 9611 specifically permit a guardian to participate in such proceedings, and provide for notice to him, thereby recognizing his status as guardian. The effect of the proceeding on the guardian is only incidental and consequential. For the adoptee, whose interests are controlling, it involves broader humanities, a close relationship with the adoptive parents, a new home and rights of heirship under Sec. 9614. And while, because of these changed conditions, the proceeding might call for a termination of the guardianship and a final settlement of the estate, yet it would not make the guardian's appointment void *ab initio*, nor would it assail the judgment appointing him.

The next jurisdictional question is whether the adoption proceeding in the juvenile court of Jackson county was void because the court had no jurisdiction over the *person* of the boy. Under Sec. 9608 that depended on: (1) whether he "resided" in Jackson county; (2) or whether he had "no place of abode in this state",[7] and the respondents resided there, as they admittedly did. The decree of the juvenile court held the boy also resided in that county, and the intervenor appealed. A determination of this question requires a statement of further facts.

As nearly as we can ascertain from the confusing testimony, the parents lived in Douglas county on the father's farm from 1939 to 1942, when the mother died. The father (Jess Duren) abandoned

---

[6]Citing: 1 C. J. S., p. 1149, sec. 52; State ex rel. Gott v. Fidelity & Dep. Co., 317 Mo. 1078, 1089(e)-1090 (f, g), 298 S. W. 83, 88 (8-10). See also 89 A. L. R. 1102 and 119 A. L. R. 594, 599, Annotations.

[7]Such fact issues are treated as raising a question of jurisdiction over the person. State ex rel. Crouse v. Mills, 231 Mo. 493, 499(2), 133 S. W. 22, 24(3).

the farm and took up Government construction work all over the United States. His legal residence continued to be Douglas county. He voted there, but maintained no home anywhere, and his actual residence was outside the county. There was testimony that he endeavored, unsuccessfully, to find a ■■■■■ home for the boy in St. Louis where his two unmarried sisters, Bertha and Marge Duren, lived and worked. Then he left the boy with his brother, Mac Duren, in Douglas county, until August, 1943, when the latter's wife died. After that the boy lived with the intervenor, his maternal grandmother, for about ten months until June 1, 1944, when the father took the boy to his sisters in St. Louis for about four days; summoned his sister, the respondent Eva Duren, from Kansas City and turned the boy over to her. She and her husband have had him ever since.

Sometime in 1943 the father developed a cerebral ailment. He had been visiting the boy occasionally, and sometimes overnight, while the latter lived with the intervenor; and was, himself stricken and confined to bed there through December, 1943. Early in 1944 he underwent brain surgery at a St. Louis hospital and later went to another hospital. As stated, he delivered the child to respondents about June 1, 1944. He never recovered and died on August 21, 1944. Prior to his death he had been commuting between the homes of his sisters in St. Louis and Kansas City and staying with them.

There was scant direct evidence as to the father's actual intent with respect to the boy's residence. His sister Marge Duren testified he said he wanted the boy's home to be with the respondents in Kansas City; and that the intervenor had said she was in ill health and that "the boy was too much for her." Intervenor's counsel invoked the "dead man's" statute Sec. 1887, when respondent Eva Guerry attempted to tell what the arrangement was between her and the boy's father. But she was permitted to deny it was merely that she should keep the boy while the father was sick and then return him to the intervenor. She was also allowed to state the father's reason for taking the boy from the intervenor's home was that "he did not like the surroundings that the boy was living in, the house conditions and surroundings."

And there was substantial testimony—some disinterested—to that effect, concerning the boy's diet, health, cleanliness, habits and general environment while in the intervenor's home. She was a good woman but was forced to work away from home a good deal. She lived in a three room house for which she paid $7 per month rent; had one or more people living with her; and had been employed at a cafe for three months when her deposition was taken in February, 1943. She denied the foregoing testimony and said she was able to take care of the boy. The "dead man's" statute was not invoked against her, and she testified freely that when the father took the boy from her he promised to return him to her in three or four weeks;

and she introduced a letter written to her by the respondent Eva Guerry in July, 1944, in which the latter said in substance that she was keeping the boy so the father could see him, and that when the father "had fully recovered" both the father and boy would be returned to her (intervenor's) home.

Respondents' brief argues Mrs. Guerry's letter was written to console the grandmother (the intervenor) and to spare her feelings. Plainly it was conciliatory, but conditioned on the assumption that the father would recover from his illness. Considering the letter and the other evidence as a whole, we think it shows the father was apprehensive about his health, a fugitive from his disease, and physically incapable of maintaining a home for his son; that he finally concluded the best place for the boy was in the home of his sister, Mrs. Guerry in Jackson county at Kansas City; and that he placed the boy in that home with the intent that it should be the boy's place of residence indefinitely—having in mind the condition of his health and the possibility or probability of his death, but not intending to surrender possession of the boy permanently if he recovered. It was, conditionally, a disposition causa mortis.

Now in these circumstances can it be said the adoptive boy was a "resident" of Jackson county when respondents filed the adoption suit there; or must it be held that he still resided at his father's technical place of residence in Douglas county, although the father had decided it was not the best place for the boy. The words "residence", ▉ "place of abode" and "domicile" have many meanings in different connections,[8] as in the laws governing administration, attachment, divorce, insurance, right of suffrage, taxation, etc. While all three expressions have sometimes been said to be synonymous, yet etymologically the word "residence" is probably the weakest and most general of all. It means the place where one resides, or sits down or settles himself, and is largely a matter of intention not involving dominion over the particular spot or domicile. Nevertheless it ordinarily implies something of permanence or continuity at least for an indefinite period, to the exclusion of another contemporaneous residence.

The boy in this case being a minor, and only eight years old, his place of residence could be selected only by his parent. And the question is whether the father by his intent and physical delivery of the boy could establish conditionally one place of residence for the boy with the respondents and retain another for himself at the same

---

[8] 37 Words & Phrases (Perm. Ed.) "Residence", pp. 215-271; 32 ibid., "Place of Abode", pp. 562-3; 13 ibid., "Domicile", pp. 258-305; Sec. 655, R. S. 1939 and Mo., R. S. A.; State v. Bowdry, 346 Mo. 1090, 1097-8(4), 145 S. W. (2d) 127, 130-1(9); State ex inf. McKittrick v. Wiley, 349 Mo. 239, 253(7), 160 S. W. (2d) 677, 686 (20); State ex rel. Kelly v. Shepherd, 218 Mo. 656, 666, 117 S. W. 1169, 1171-2 (2, 6), 131 Am. St. Rep. 568.

time. Both parties cite two Missouri cases[9] in which the appointment of a guardian of a minor was challenged, and the issue was whether such proceedings must be brought in the county where the parents resided, or in the county of the residence of persons to whom the parents had delivered custody of the minor.

The Cox case, just cited, held the county of the minor's actual residence was the proper venue, since the parent "had surrendered the child to her grandfather, and the latter stood in loco parentis toward her, and therefore his residence was her residence." The Smith case held the Cox opinion meant this rule should apply only where the parent had surrendered the child in the sense of abandoning it —which is not the situation here. Sec. 378, governing the appointment of guardians of minor orphans or children of disqualified parents, fixes the venue in the county of the minor's "domicile", or if there be none in this State, then in the county of his "actual residence." And there are several other Missouri decisions holding that as to the appointment of guardians minor orphans retain the residence of their last deceased parent.

But we are convinced these decisions are not controlling in all circumstances. In adoption proceedings brought under Sec. 9608, the word "resides" must be construed in harmony with the spirit and purpose of the adoption Act of 1917; and the welfare of the parents and child should be controlling. If the last surviving deceased parent left the child in a home of his choice with the intent that it should reside there permanently in the event of his death, we can see no reason why that disposition should not fix the child's "residence" under the statute, even though it was not a complete abandonment. Especially should this be true when the child is left with near kin.

There is considerable authority to the effect that if a statute requires an adoption suit to be brought in the county of the adoptee's residence, it is a condition precedent to a valid adoption.[10] But as to what constitutes "residence", the decisions are not in accord. In states adhering to the doctrine that statutes authorizing adoptions are in derogation of common law and should be strictly construed, the rule usually is that the residence of the child continues to be that of the deceased parents, notwithstanding they had placed it in other hands, unless they had abandoned it.[11] But in states taking a more

---

[9]Cox v. Boyce, 152 Mo. 576, 583(4), 54 S. W. 467, 468(3), 75 Am. St. Rep. 483 and Smith v. Young, 136 Mo. App. 65, 73-5(2, 3), 117 S. W. 628, 631(2, 5, 6).

[10]1 C. J., p. 1384, sec. 55; 2 C. J. S., pp. 416-7, sec. 35b; 1 Am. Jur., p. 636, sec. 32.

[11]Morris v Dooley, 59 Ark. 483, 485-6, 489, 28 S. W. 30, 31, 430; Rives v. Sneed, 25 Ga. 612, 616, 621; Shirley v. Grove, 51 Ind. App. 17, 19, 98 N. E. 874, 875(2); Johnson v. Smith, 94 Ind. App. 619, 622-3, 180 N. E.

1234

liberal view because of the beneficent objectives of the ▮▮▮ legislation, the words "residence" or "residing" are not construed so strictly.[12]

Glancing at the decisions cited below in marginal note 12. In the Kugle case, a widowed mother in Alabama placed her five year old daughter in the home of a married couple in Georgia. A few months later when they filed an adoption proceeding there she gave her written consent. But before the case was tried she got possession of the child by a ruse and took her back to Alabama. On habeas corpus the Alabama Supreme Court held that "by the acts of her mother, she (the little girl) acquired a domiciliary status in Georgia;" and ordered her surrendered to the intended adopters in that state.

In the Portman case the mother of a female child died, and the father also died in about a year. But in the meantime he "gave" her to his father in T county in consideration of the latter's supporting and educating her. He also told his brother he wanted their father to "take and rear" the child. She remained with the paternal grandfather for two years, when the maternal grandfather in F county obtained a decree of adoption on the representation that she resided in that county. On the foregoing evidence the Supreme Court of Georgia held that T county was her domicile, and that the adoption in F county could be consideread obtained by fraud.

The Woodward case and the Stearns case both held, in substance, that residence of the adoptee in the state of adoption is unnecessary. The latter pointed out that a State has jurisdiction for many purposes of persons dwelling there, who retain their domicile elsewhere— such as enforcement of criminal and police regulations and relief of the distressed. And the adoption there under adjudication was validated although it was conceded, arguendo, that the domicile of the adoptee was technically that of the parents in another state. The Wolf case from Pennsylvania, where the statute required the adopter to be a "resident" of the state, held that *temporary* residence was sufficient. And the Van Matre and Hopkins decisions from Illinois followed that doctrine. The Pratt case from Minnesota held an adoptee might be a *resident* of that state although the *domicile* was in another state where the parents lived. And in the Nebraska case

188, 189 (1, 5); Greene v. Willis, 47 R. I. 375, 376-7, 133 Atl. 651(2, 3); In re Holder, 218 N. C. 136, 141(6), 10 S. E. (2d) 620, 623(8); In re Adoption of ———, 22 N. J. Misc. 181, 37 Atl. (2d) 645, 648(11).

[12]Kugle v. Harpe, 234 Ala. 494, 496-7(9), 176 So. 617, 618-9(9); Woodward's Appeal, 81 Conn. 152, 167(3), 70 Atl. 453, 459 (11); Portman v. Mobley, 158 Ga. 269, 271, 273, 123 S. E. 695, 696-7; Van Matre v. Sankey, 148 Ill. 536, 550-1(2), 36 N. E. 628, 629-30, 23 L. R. A. 665, 39 Am. St. Rep. 196, 200, note; Hopkins v. Gifford, 309 Ill. 363, 369(3), 141 N. E. 178, 181 (4); Stearns v. Allen, 183 Mass. 404, 409, 67 N. E. 349, 350-1, 97 Am. St. Rep. 441; In re Adoption of Pratt, 219 Minn. 414, 421(3), 18 N. W. (2d) 147, 151(4); Milligan v. McLaughlin, 94 Neb. 171, 176, 142 N. W. 675, 677(2), 46 L. R. A. (N. S.) 1134; Appeal of Wolf, 10 Sad. (Pa.) 139, 13 Atl. 760, 764.

an adoption decree was upheld, although rendered in a county where none of the parties lived, since they had submitted themselves to the jurisdiction.

Our Missouri statute, Sec. 9608, discloses that residence of the child in the county where the adoption is decreed is not basically essential for it also permits adoptions in the county where the adopters reside if the adoptee "has no place of abode in this state." In other words aliens could be adopted. And we have one decision that seems to be somewhat in point. In Ex parte Fichtel, 229 Mo. App. 847, 855-6(4), 84 S. W. (2d) 977, 982(4), the unmarried mother of an infant boy, residing in St. Louis, gave him to a married couple in another county for support and education. They obtained a decree of adoption in that county, the mother filing her written consent, which disclosed she lived in St. Louis. Later the mother married the natural father of the boy and they sought to recover him by habeas corpus, claiming the court had no jurisdiction of the adoption because the child's domicile was not in the county where the decree was rendered, but in St. Louis where the mother lived. The Springfield Court of Appeals overruled this contention, holding the mother "by her *consent* said that she was in Crawford county" and therefore had entered her appearance.

Sec. 645 forbids a construction of statutes limiting their scope or effect merely because they are in derogation of the common law. And aside from that, our courts are not wedded to the doctrine of "strict" and "liberal" construction of statutes. They seek to arrive at the intention of the Legislature as disclosed, in part at least, by the objectives of the legislation. Meyering v. Miller, 330 Mo. 885, 892(3), 51 S. W. (2d) 65, 68(2). We adhere to the same course in adoption cases. Shepherd v. Murphy, 332 Mo. 1176, 1180-1(3), 61 S. W. (2d) 746, 748(3); Drake v. Drake, 328 Mo. 966, 972-3(2), 43 S. W. (2d) 556, 559(3). Following that rule of construction we think the residence of the boy in the instant case was in Jackson county with the respondents, because of the father's wishes and arrangement contingent on his death, which occurred in less than three months, as heretofore stated. And in this connection we add that Sec. 9616 was not violated by this *conditional* disposition of the boy. Ex parte De Castro (Mo. App.), 190 S. W. (2d) 949, 956(10). Neither did it invalidate the adoption by reason of that statute, Drake v. Drake, last cited above.

██ We have not reviewed the evidence concerning the respondents' character, home surroundings and general ability and worthiness to assume the obligations of adopting parents—all this bearing on the welfare of the child. The trial court and the Court of Appeals both agreed the adoption would conduce to the child's welfare so far as that question was concerned, and we agree.

1236

Also an objection was made by the intervenor because the respondents are Catholics, whereas she is a Baptist and the father and mother of the boy belonged to the Christian church. It was shown also that one of the father's sisters is a Baptist and his brother Mac· is a Methodist. Neither the father (obviously) nor any of his side of the family objected to respondents' religion. Intervenor invokes Sec. 392, forbidding the appointment of guardians of a religious faith different from that of the parents, if another suitable person can be procured, unless the minor, being of proper age (14 years), shall so choose. Likewise, Sec. 9691 is cited, applying to juvenile courts committing the children to other than public institutions. It provides the court shall endeavor to place them with an association or person of the same religious belief as the parents, so far as practicable. There appear to be no decided cases construing this section. But it has been held that Sec. 392 puts practicalities and temporal considerations first. And here again the wishes of the last surviving parent have great weight. Voullaire v. Voullaire, 45 Mo. 602; Brewer v Cary, 148 Mo. App. 193, 202 et seq., 127 S. W. 685, 687 et seq.; Parks v. Cook (Mo. App.), 180 S. W. (2d) 64, 69(6).

We find no error in the record, and the decree of the circuit court therefore is affirmed. All concur.