WILLIAM T. URIE v. GUY A. THOMPSON, Trustee of the MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Appellant.—No. 39908. —210 S. W. (2d) 98.

Court en Banc, March 8, 1948.

Rehearing Denied, April 12, 1948.

Thomas J. Cole, Gardner Smith, D. C. Chastain, Lyman J. Bishop, H. E. Sheppard and Patterson, Chastain, Cowherd & Smith for appellant.

*Samuel L. Trusty, Louis N. Wolf, W. M. Anderson, David Trusty, Guy W. Green* and *Trusty & Pugh* for respondent.

[99] VAN OSDOL, C.—Action under Federal Employers' Liability Act, 45 USCA, Sec. 51 et seq., charging violations of the Boiler Inspection Act, 45 USCA, Sec. 22 et seq. A jury returned a verdict awarding plaintiff $30,000 damages and defendant, trustee of Missouri Pacific Railroad Company, has appealed from the judgment entered.

Heretofore the case has been considered upon the question of the sufficiency of the original petition [Urie v. Thompson, 352 Mo. 211, 176 S. W. (2d) 471], it being held the petition stated facts sufficient to support a recovery for a breach of the Boiler Inspection Act. Upon remand, plaintiff amended his petition to more specifically allege violations of the Act.

[100] The petition as amended contained the allegations that defendant caused, allowed and permitted noxious, deleterious and poisonous dusts and sand, in harmful quantities, the same varying from day to day, to enter the cabs and decks of locomotives in which plaintiff was required to work as a fireman, whereby plaintiff gradually inhaled silica particles resulting in silicosis, or silico-tuberculosis—defendant's locomotives were unsafe to operate in the service and constituted an unnecessary peril to life and limb in that dusts and sand would and did enter into and permeate the cabs and decks in quantities harmful to plaintiff to breathe; the sanding devices would loose sand so that harmful quantities would come from the same when set in operation; the sand domes were loose at the boiler connections; the sand pipes were broken off, or were loose or perforated; the traps holding sand were not in proper mechanical condition and were not properly adjusted; the connections between the boiler and the deck were old, worn, or loose; the grate-staff riggings were without covers, or the covers were warped, or bent, or did not fit; the floor boards were worn, or loose, or contained open spaces; and defendant failed to maintain his locomotives, cabs and decks where plaintiff was required to work, in safe condition.

Defendant denied the locomotives were in an unsafe condition; and denied plaintiff became disabled as a result of the inhalation of any deleterious substance entering into the cabs and decks of defendant's engines. Defendant alleged the locomotives were regularly inspected by inspectors of the Interstate Commerce Commission, and that all regulations of the Commission had been complied with; averred silicosis is not within the purview of the Boiler Inspection Act; and further interposed the plea of limitation of action (45 USCA, Sec. 56).

On this appeal there are thirty-two assignments of error. Not all of the assignments were developed in appellant-defendant's brief by citation of authorities and argument. The assignments of error neither briefed nor argued are, for the purpose of this appeal, abandoned. Petty v. Kansas City Public Service Co. (Mo Sup.), 198 S. W. (2d) 684; Supreme Court Rule 1.08. The scope of review of the instant case, an action at law tried upon facts with a jury, is generally governed by Sections 123 and 140, Civil Code of Missouri, Laws of Missouri, 1943, p. 390 and pp. 395-6, and Rule 1.08, supra, but with a regard for Supreme Court Rule 3.27. See In re Duren, 355 Mo. 1222, 200 S. W. (2d) 343, treating with a case tried upon facts without a jury.

It is said by defendant that the petition does not state and the evidence does not support a claim under the Boiler Inspection Act; and that plaintiff's action is barred by limitation; and errors are assigned in the admission and exclusion of evidence, and in instructing the jury.

Plaintiff, now 57 years old, had commenced work for the Missouri Pacific Railroad Company July 4, 1908, and left defendant's employment in May, 1940. He was principally employed as a fireman on engines on the line from Joplin to Kansas City. He had been interested in a mine and, early in his employment and when he was on the extra board, ran a hoister and pumped water for about sixty days down at "Tan Yard Holler." He also worked out at "Smeltry Hill" for about three weeks; "put in a pump and operated it a while." He had not worked as a "regular miner, down in the mine getting out ore." In 1914 he had "walking typhoid"; he "laid off" and went to Oklahoma, being away from his work with the Missouri Pacific five or six months; however, he worked on all but about 60 days of that time for a contractor in the Oklahoma oil fields.

The sand used in the sanding devices of defendant's locomotives was "tailings" from the lead and zinc mines of Webb City and Carterville, Jasper County. The tailings were also used as ballast on the roadbed. Various samples of the tailings or sand contained 97.2% to 97.87% free silicon dioxide. Sand used in the engines was finely ground. A sample of sand exhibited by defendant and stated to have been crushed under the wheels of a locomotive contained 97.8% silicon dioxide—96% passed through a 20-mesh screen, [101] 74% passed through a 40-mesh screen, 46% passed through an 80-mesh screen, 45% passed through a 100-mesh screen, 29% passed through a 200-mesh screen, and 9% passed through a 325-mesh screen. 8.25% of the particles were of 10 microns size or smaller. Of the sand exhibited by defendant (which, it was stated, had not been crushed beneath the wheels of a locomotive), no particles passed through a 325-mesh screen. A witness for plaintiff testified of a test made by him at plaintiff's request. Sand, stated to have been procured from

defendant's sand house at Joplin, was placed in a glass jar. The jar and contents were shaken and a sample of the air "in the space at the top of the jar" was found to contain 5,100,000 particles smaller than 10 microns, and 750,000 particles smaller than 5 microns per cubic foot of air. (Physicians, witnesses for plaintiff, testified the specific concentration of particles under 10 microns in size and of 97.% free silica which may "be present in the air a person breathes without harmful effects" is 3,000,000 to 5,000,000 per cubic foot.) The witness was asked, "If you had this sand blown from the sander on the engine two-thirds of the length of the engine by air pressure, if it was this kind of sand, and it was blown that distance, you would have a much lesser percentage of particles smaller than ten microns? A. My answer would be conjecture. I have had no experience in testing samples under those conditions. The concentration present in the air under those conditions would be the result of many factors."

Plaintiff testified that in May, 1940, he commenced to have pains "all through" his chest; he got very short of breath and "kept getting a little worse and a little worse." He consulted a physician who took X-ray photographs; and later, June 21st, plaintiff reported to the hospital of the Missouri Pacific Association at St. Louis for examination. X-ray films disclosed a mottled "snow storm effect" (diffused throughout the upper two-thirds of both lungs), said by experts, witnesses for plaintiff, to be indicatory, in their opinion, of nodules formed in the calcification of the pulmonary fibrosis, scar tissue, formed after a person has harmfully inhaled silica dust into the lung structure itself. Plaintiff's experts "came to the conclusion the man was suffering from a disease known as silicosis."

Physicians, specialists in diseases of the lungs, witnesses for defendant, were of the opinion plaintiff suffered pulmonary tuberculosis; that the X-ray photographs disclose a tuberculosis infection that is widespread throughout the upper and lower lobes equally; that X-ray findings do not suggest silicosis; and that the small calcified "snow storm effect" areas are typical of what are called Ghon's nodes, that is, simply a tuberculosis of the lungs which heals out with small circumscribed places "that are all the same size, and they heal out, more or less, with a calcification in the area."

Bruce Brill, a witness for plaintiff, testified he had worked at the Missouri Pacific roundhouse at Joplin for about 18 years and until November 4, 1942; that the "engines that came in . . . I would say most of them, at least three out of five, would have the sanders reported in bad order . . . maybe it was a broken nipple, something in the dome, or a loose connection." A broken nipple would cause the sand to dribble on to the rails under the drivers, and the "speed would suck it up into the cab after it was ground under the wheels." The dust would be sucked in "through the deck and around the boiler head or openings in the grate shakers." When

the witness cleaned out the cabs he found sand particles and roadbed dust. Plaintiff had worked on coal burning engines. When shoveling coal he was "something like two feet" from the grate shaker openings. Some coal dust would be stirred up, but "we had a hose there to keep it dampened down good." (The relationship that exists between the breathing of inorganic dust and tuberculosis has always been believed to be a close one. However, there is a strong tendency to assume that coal dust of itself is relatively harmless and that when mixed with silica has a retarding influence not only on the effects of the silica but also on the tubercle bacillus. Norris-Landis, Diseases [102] of the Chest, 6th Ed., p. 578; Rubin, Diseases of the Chest, p. 340.) Plaintiff testified the (sand) dust would "come up through the openings in the cab floors, around the grate shaker riggings and the stoker head in the deck of the engine on each side of the fire door against the boiler head. . . . Sometimes there would be wide cracks between the boiler head and the deck floor where the bolts were broken off and it was worn and loose. The deck boards would be cracked and sometimes slivered out, and it would come through any openings like that; . . . would collect on the lights; . . . would get our clothing very dusty; . . . make your mouth and nose very dry."

Negligence is not the basis for liability under the Boiler Inspection Act. Instead, it "imposes upon the carrier an absolute and continuing duty to maintain the locomotive, and all parts and appurtenances thereof, in proper condition, and safe to operate . . . without unnecessary peril to life or limb." Southern Ry. Co. v. Lunsford, 297 U. S. 398, 56 S. Ct. 504. See also, Lilly v. Grand Trunk Ry. Co., 317 U. S. 481, 63 S. Ct. 347, and cases therein cited. The Interstate Commerce Commission is authorized to set the standards of compliance by prescribing "rules and regulations by which fitness for service (of locomotives, tenders and their appurtenances) shall be determined", Napier v. Atlantic Coast Line, 272 U. S. 605, 47 S. Ct. 207, provided the Commission finds such are required to remove unnecessary peril to life or limb. The Act is to be liberally construed in the light of its prime purpose, the protection of employees and others by requiring the use of safe equipment. Lilly v. Grand Trunk R. Co., supra. In the Lilly case the Supreme Court of the United States observed the Interstate Commerce Commission had set a standard by promulgating a rule (No. 153) that the "top of tender behind the fuel space shall be kept clean . . ." The petitioner, Lilly, fell from the top of the locomotive tender. "As to the circumstances of the accident, petitioner testified that the top of the tender (over an area of some six square feet) was covered with ice." Standing on the ice petitioner reached (by means of a hooked rod) for a water spout preparatory to filling the tender's tank with water. As he pulled the spout, the rod's hook slipped on the spout,

and his feet simultaneously slipped on the ice, causing him to fall to the ground. Since the jury found the tender did not leak, the condition was not due to any mechanical defect; nevertheless, the top of the tender had not been kept "clean" as required by Rule 153, and the foreign matter, ice, caused the "accident." The injury in the Lilly case was *accidental*. In the former review (Urie v. Thompson, supra) this court ruled with the Lilly case that (in order to state a violation of the Boiler Inspection Act) it is unnecessary that there be alleged (or shown) a *defect* in construction or mechanical operation. It was said, a sanding device "which is out of adjustment is an *unsafe* appliance, the very thing that the carrier, under the Boiler Inspection Act, *insures* against." In the former review this court did not treat with a contention that "silicosis" is not an evil at which the Act is aimed. If none of the consequences which a statutory enactment was designed to guard against has resulted from its breach, such a breach does not constitute an actionable wrong, even though some other injurious consequence has resulted. 38 Am. Jur., Negligence, Sec. 163, p. 834; Vol. II, Restatement of the Law of Torts, Sec. 286, p. 752, et seq.; 45 C. J., Negligence, Sec. 111, pp. 726-7.

This brings us to a more particular examination of appellant-defendant's contention that the Boiler Inspection Act is designed to guard against "accidental" injury, and that silicosis is not within the purview of the protection of the Act. Respondent-plaintiff has reminded us of Rules 101, 116(a), and 120, approved by orders of the Interstate Commerce Commission. Rule 101 provides that the railroad company will be held responsible for the general design, construction, and maintenance [103] of locomotives and tenders under its control. Rule 116(a) provides that cabs shall be securely attached or braced and maintained in a safe and suitable condition for service; and cab windows shall be so located and maintained that the enginemen may have a clear view of track and signals from their usual and proper positions in the cab. And Rule 120 provides that locomotives shall be equipped with proper sanding apparatus, which shall be maintained in a safe and suitable condition for service, and tested before each trip. Sand pipes must be securely fastened in line with the rails. Generally, these rules appear to be directed to the safe construction, and the maintenance of the locomotive and its appurtenances or equipment in a safe and suitable condition for the operational service "to which the same are put", all to the end "that the same may be employed in the active service of such carrier without unnecessary peril to life or limb." 45 USCA, Sec. 23, infra. The prime purpose of the Act being the protection of employees (and others) by requiring the use of safe equipment, the Act should be given liberal, not a narrow or strict, construction. Yet the Act, imposing an absolute duty to use safe equipment, should justly be

interpreted as imposing the duty to keep the equipment safe in the protection from those injuries within the fair meaning of the language used. Compare Johnson v. Southern Pacific R. Co., 196 U. S. 1, 25 S. Ct. 158. See also discussion of interpretation of Statutes, United States v. American Trucking Associations, 310 U. S. 534, at pages 543-4, 60 S. Ct. 1059, at pages 1063-4. It is fairly and reasonably to be understood from the reading of the Rules and the Section that the purpose of the Act is to impose the absolute duty to so maintain the locomotive, and all parts and appurtenances thereof for service that unnecessary risks of accidental injury are avoided. There seems to be no expression reasonably indicatory of a purpose to require the engine and its appurtenances to be so constructed and maintained as to protect against injuries due to the presence of dusts in the cabs of locomotives. There is a definite differentiation generally, in the adjudicated cases, between "accidental injury" (accidental in the sense that the injury is attended by force or violence), and pneumoconiosis (including silicosis), which is evidenced by pathological changes in lung structure attributable to the effects of the inhalation of harmful dusts over a period of time. Vol. 1, Words and Phrases, Perm. Ed., Accident, p. 250, particularly at page 299 et seq.; Smith v. Harbison-Walker Refractories Co., 340 Mo. 389, 100 S. W. (2d) 909; Bolosino v. Laclede-Christy Clay Products Co. (Mo. App.), 124 S. W. (2d) 581; Wurst v. American Car & Foundry Co. (Mo. App.), 103 S. W. (2d) 6; Billo v. Allegheny Steel Co., 328 Pa. 97, 195 Atl. 110. See also, Norris-Landis, Diseases of the Chest (6th Ed.), p. 568; Mansfield v. Wagner Electric Mfg. Co., 294 Mo. 235, 242 S. W. 400.

Defendant cites the case of Napier v. Atlantic Coast Line, 272 U. S. 605, 47 S. Ct. 207. The reading of this case does disclose a tacit recognition of the validity of the States' argument that the federal regulation endeavors solely to "prevent accidental injury in the operation of trains." The subjects of the state statutes involved in the case, and of the Boiler Inspection Act were the same—"*the equipment of locomotives.*" It was held that state legislation (although endeavoring to prevent sickness and disease and *affecting safety,* if at all, only incidentally) was precluded, "because the Boiler Inspection Act, as we construe it, was intended to occupy the field. The broad scope of the authority conferred upon the Commission leads to that conclusion. Because the standard set by the Commission must prevail, requirements by the States are precluded, however commendable or *however different their purpose*" (our italics). The Commission's power is ample to prescribe equipment promoting health, because "keeping firemen and engineers in good health, like preventing excessive fatigue, through limiting the hours of service", *clearly promotes safety.* After the Napier decision there were further subsections added to Rule 116. We particularly notice subsection

(g), added [104] May 7, 1928, "Unnecessary or excessive openings in locomotive cabs around reverse levers, grateshaker levers, pipes, rods, running boards, doors, windows, between cab and boiler, around wind sheets, or at any other place in cab or deck where rain, snow, or wind may enter shall not exist on any locomotive used during the period from November 1 to April 1 within the territory (including Missouri) specified in paragraph (d)." Such subsection was manifestly added in the purpose of protecting from inclement weather generally attending the stated period of the year in the stated territory. By thus being protected from the discomfort and distraction of the rain, snow and wind the engineer and fireman are more attentive—this clearly *promotes safety.* Napier v. Atlantic Coast Line, supra.

Plaintiff has cited the case of Sadowski v. Long Island R. Co., 292 N. Y. 448, 55 N. E. (2d) 497, wherein a recovery under the Federal Employers' Liability Act was upheld for silicosis with tuberculosis superimposed. A substantial part of plaintiff's duties was to fire stoves and handle sand, in a sand house, in a sand-drying and screening process preparatory for the use of the sand in defendant's locomotives. The action was based upon negligence. Defendant should have taken precautions to protect plaintiff from the consequences which might reasonably be anticipated from being required to work "in more or less of a cloud of silica dust which enveloped him and which he necessarily inhaled." This case is not helpful upon the question whether an injury, a so-called "occupational disease", as distinguished from accidental injury, is within the protection designed to be afforded by the Boiler Inspection Act.

At the first national convention of state railroad commissioners held in March, 1889, a resolution was adopted, "Whereas thousands of railroad employees are killed or injured in coupling or uncoupling freight cars in interstate traffic and in handling the brakes of such cars, and most of these accidents can be avoided by the use of uniform automatic couplers and train brakes; . . . Resolved, that we do respectfully and earnestly urge the Interstate Commerce Commission to consider what can be done to prevent loss of life and limb in coupling and uncoupling freight cars in interstate commerce. . . . " The requirements of the various states relating to the equipment were then conflicting and diverse. President Harrison, in his final message to Congress, December 5, 1892, said, "Statistics . . . show that during the year ending June 30, 1891, there were forty-seven different styles of car couplers reported to be in use, and that during the same period there were 2,660 employees killed and 26,140 injured. Nearly sixteen per cent of the deaths occurred in the coupling and uncoupling of cars, and over thirty-six per cent of the injuries had the same origin." To meet this situation, Congress, in 1893, enacted the original Safety Appliance Act, and somewhat later, and for like reasons, the Hours of Service Act, followed in time by the Ash Pan Act, and

the Boiler Inspection Act. See Vol. 2, Roberts, Federal Liabilities of Carriers (2d Ed.), Sec. 501, pp. 1023-1026. The origin and history of the Boiler Inspection Act is also stated in Napier v. Atlantic Coast Line, supra (272 U. S. at pages 608-609). The Boiler Inspection Act, as enacted in 1911, applied only to the boiler. Its purpose was ''to promote the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their locomotives with safe and suitable boilers and appurtenances thereto.'' 36 Stat. 913. The Act was extended by amendment in 1915 to include the entire locomotive and tender and all parts and appurtenances. 38 Stat. 1192. In 1924, the Act was further amended, 43 Stat. 659, so that Section 2 thereof reads, ''That it shall be unlawful for any carrier to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed [105] in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time in accordance with the provisions (see Sections 28, 29, 30 and 32, 45 USCA of this Act and are able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for.'' 45 USCA, Sec. 23. (We see it is provided in Section 8 of the Act, 45 USCA, Sec. 32, ''In the case of *accident* resulting from failure from any cause of a locomotive boiler or its appurtenances, *resulting in injury or death* . . . a statement forthwith must be made in writing of the fact of such accident'' (our italics). In a footnote at page 609 of 272 U. S. (Napier v. Atlantic Coast Line, supra) are listed some of the various devices the Interstate Commerce Commission had required as equipment for the locomotives used in interstate commerce. And the more recent rules and regulations for inspections of locomotive boilers and their appurtenances are found in 49 CFR, Section 91.1 et seq., page 1236 et seq. From these rules it is apparent the Interstate Commerce Commission has looked to the safety of the employee as purposed by the Act from the standpoint of safety from accidental injury in the operation of trains. It seems to us the Act (considering the language of the Act itself, its preamble, its history, and its ancillary regulations) is aimed at promoting safety from accidental injury, as distinguished from injury due to the gradual inhalation of harmful dusts.

The judgment should be reversed.

It is so ordered.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., in Division One, is adopted as the opinion of the Court en Banc. All the judges concur.