**J. C. ELLIS, Appellant,**

v.

**E. L. FARMER, Respondent.**

No. 44553.

Supreme Court of Missouri.

Division No. 2.

March 12, 1956.

George W. Barham, Blytheville, Ark., Von Mayes, Fred Henley, Caruthersville, Edward F. Sharp, New Madrid, for appellant.

Ward & Reeves, Caruthersville, for respondent.

BOHLING, Commissioner.

J. C. Ellis, appellant, owned and operated the Ellis Gin Company and the Ellis Implement Company at Barfield, Arkansas, and had land in Pemiscot and Dunklin counties, Missouri. E. L. Farmer, respondent, was a farmer raising cotton, soybeans and other crops. Under arrangements made, appellant was to "furnish," that is, advance credit or funds for respondent's produc-

**842**

tion of crops, living expenses et cetera, and respondent was to deliver his crops to appellant for credit on his account when sold and payment to respondent of any surplus. This suit involves their transactions for the crop years 1947 through 1950, and resulted in a judgment on respondent's counterclaims against appellant for $97,731.68.

On January 22, 1952, appellant sued respondent in replevin. The action was based on a $24,816.50, February 28, 1950, note, payable October 15, 1950, having a balance due of $15,640.64, secured by a chattel mortgage on certain farm machinery and equipment of respondent. A replevin bond was given and the property was sold on February 2, 1952, for $7,755.50.

Respondent filed answer and counterclaims. Respondent admitted the execution of the note and chattel mortgage, but alleged they were without consideration and were the result of fraud chargeable against appellant in their business transactions. Respondent asked judgment against appellant in connection with his answer for the value of said farm machinery and equipment; and in his counterclaims, in separate counts, judgments for what respondent claimed due from appellant on a proper accounting and for which credits had not been given for the crop years 1947, 1948, 1949 and 1950, being Counts 1, 2, 3 and 4, respectively, of the counterclaims; and in Count 5 for $23,750 on the theory respondent had deeded his home place of a value of $30,000 to appellant in 1951 for a purported balance due appellant of $30,000, which respondent did not owe, less $6,250 "furnish" thereafter received from appellant; and in Count 6 for $1,350 for the sale of an Allis-Chalmers tractor to appellant; and in Count 7 for $1,550 for hauling cotton to appellant's gin in Arkansas.

The issues involved "a long and complicated account," according to appellant's motion for the appointment of a referee, and, the parties agreeing, a referee was appointed. The trial began September 17, 1953. The referee's findings were in favor of respondent, with the exception of Count 7.

Judge Arthur U. Goodman of the Twenty-second Judicial Circuit was called in upon Judge Joseph H. Allen, of the Pemiscot county circuit court, disqualifying. The referee's report was confirmed in full and judgment was entered accordingly.

The judgment, entered June 29, 1954 (overruling the exceptions of appellant to the report of the referee), confirmed and approved the findings of fact and conclusions of law of the referee, in favor of respondent on appellant's petition and respondent's answer in the sum of $17,916.41 ($15,640.64 plus $2,275.77 interest); for respondent on his counterclaims as follows: Count I, $14,177.34 ($10,313.91 plus $3,863.43 interest); Count II, $11,491.64 ($8,741.06 plus $2,750.58 interest); Count III, $1,694.21 ($1,350.30 plus $343.91 interest); Count IV, $22,997.16 ($19,249.75 plus $3,747.41 interest); Count V, $27,599.16 ($23,750 plus $3,849.16 interest); Count VI, $1,855.76 ($1,350 plus $505.76 interest); and on Count VII, for the appellant and against the respondent. The amounts first stated within the parenthesis supra are the principal sums found by the referee in his report filed March 2, 1954. The costs were taxed against appellant.

Respondent's motion to dismiss appellant's appeal was ordered taken with the case. Briefly stated and so far as essential to a ruling, the motion charges that appellant failed to comply with Supreme Court Rule 1.08, 42 V.A.M.S., in that: (1) Appellant failed to make a fair and concise statement of the facts without argument, charging misstatement of facts, omission of facts favorable to respondent, and statements of conclusions and argument. (2) Appellant's statement failed to state the facts relevant to or understandably disclose the legal issues for determination. (3) Appellant's statement fails to show the specific page references of the transcript involved. (4) Appellant's "Points" are abstract statements.

This case has been twice submitted to this court. Respondent had filed a motion

to dismiss the appeal prior to the first submission for failure of appellant's brief to comply with Rule 1.08. Appellant filed a new brief on the second submission. Being forewarned, we perceive of no valid excuse for the failure of counsel to fully comply with Rule 1.08 on the second submission. The rules are not difficult to follow. The work of this court and the rights of other litigants to have their appeals determined within a reasonable time call for a compliance with the rules that we may promptly discharge our duties free of unnecessary labor and loss of time occasioned by issues that have no place in the case upon a proper presentation of the real issues on a client's appeal.

In court tried cases Section 510.310 (4) RSMo 1949, V.A.M.S. provides: "The question of the sufficiency of the evidence to support the judgment may be raised whether or not the question was raised in the trial court. The appellate court shall review the case upon both the law and the evidence as in suits of an equitable nature." See also § 512.160, Rule 3.23; Allen v. Allen, 364 Mo. 955, 270 S.W.2d 33, 34 [1]. Rule 3.27 states: "Plain errors affecting substantial rights may be considered * * * on appeal, in the discretion of the court, though not raised in the trial court or preserved for review, or defectively raised or preserved, when the court deems that manifest injustice or miscarriage of justice has resulted therefrom." Appellate courts in equity cases review the evidence, determine its value and weight, and, with due deference to the findings of the chancellor, reach their own decisions on the merits. Peikert v. Repple, 342 Mo. 274, 114 S.W.2d 999, 1002 [3], citing cases; Schebaum v. Mersman, Mo., 191 S.W.2d 671, 674 [1]; Parks v. Thompson, Mo., 285 S.W.2d 687, 692.

We understand from the statement in appellant's brief that respondent sought to defeat the note and chattel mortgage sued on, and for recoveries against appellant on the grounds of want of consideration and for fraud chargeable to appellant. While appellant's brief is not as liberal with page references to the transcript as might be, the brief does contain page references to what counsel considered the more material facts. (Some assertions in respondent's brief are unsupported by references to the transcript.) Appellant's brief mentions that respondent's evidence on the bales of cotton et cetera for which he claimed he should have received credit was given wholly from memory. Not all of appellant's points are abstract statements of law. Appellant's instant brief is an improvement over his first brief.

We mention here in connection with the foregoing and a point in respondent's brief that the findings of the referee in favor of respondent and against appellant were general rather than specific in nature. The essence of appellant's Statement, Points and Argument is the issue presented in the trial court in exceptions to the referee's findings and motion for new trial; that is, that the proof offered by respondent, respondent having the burden, was not sufficient to overcome the evidence in the case favorable to appellant and respondent was not entitled to the judgment. This is sufficient for overruling the motion to dismiss. Feigenbaum v. Van Raalte, 356 Mo. 67, 201 S.W.2d 283, 284 [1]; Billings v. Independent Mut. Fire Ins. Co., Mo.App., 251 S.W.2d 393, 396; Leslie v. Mathewson, Mo.App., 257 S.W.2d 394, 396 [2, 3]. Consult Baerveldt & Honig Const. Co. v. Dye Candy Co., 357 Mo. 1072, 212 S.W.2d 65 [1]; In re Duren, 355 Mo. 1222, 200 S.W. 2d 343, 344 [1, 2], 170 A.L.R. 391, affirming on the point, Mo.App., 195 S.W.2d 745, 749 [7]. Conclusions or arguments in a statement do not justify a dismissal where the essential facts determinative of the issue or issues presented may be ascertained from the statement. Kirkpatrick v. Wabash R. Co., 357 Mo. 1246, 212 S.W.2d 764, 765 [1]. Appeals are not lightly dismissed. The instant respondent's statement presents his view of the case on points mentioned in appellant's brief. See Carver v. Missouri-Kansas-Texas R. Co., 362 Mo. 897, 245 S. W.2d 96, 100 [3]; Laun v. Union Electric

Co., 350 Mo. 572, 166 S.W.2d 1065, 1073 [21], 144 A.L.R. 622; See v. Wabash R. Co., 362 Mo. 489, 242 S.W.2d 15, 16 [1, 2].

Respondent says appellant's ledger account showing the charges and credits between appellant and respondent was not in evidence.

Appellant, at respondent's request, produced his "books and records involved" at the hearing. Appellant, in addition to his merchandising and ginning business, had fifteen tenants. He testified that he was not at the gin all day, but was there for a while every morning and afternoon. Monte Isaac, his bookkeeper for nineteen years, made practically all of the entries. Isaac had full authority to transact business for appellant. Respondent testified he transacted all his business with Isaac, the bookkeeper. Appellant had personal knowledge of only a few of the many transactions and entries in his books, and could not swear from personal knowledge that the books and records were correct. He was general manager of the business. The books and records were kept under his supervision in the usual course of the business. He examined them about once a month, transacted his business, made his settlements, and reported his income tax according to these records. He considered they were kept correctly. Appellant had corroborative evidence on his account with respondent being correct. Mr. Isaac died January 22, 1952.

John Lenti, an auditor, audited appellant's books, showing appellant's ledger account with defendant from April 24, 1945, to April 7, 1952. Respondent called appellant "for cross-examination," had him identify Lenti's audit and, after examining him on many items in said audit, offered it in evidence as respondent's Exhibit O, stating: " * * * we do not admit the correctness of it [Exhibit O], but merely introduce it to show lack of support for the charges made." Respondent's questioning of appellant about specific items developed, in addition, that up to some time in 1949 appellant did not have his employees take vouchers for cash "furnished" his tenants;

that of the entries on respondent's Exhibit O those checked with a red pencil mark were supported by respondent's voucher and appellant did not have like supporting data for other like charges on Exhibit O (an examination of Exhibit O discloses red check marks on item after item entered in 1948 and thereafter); and that "cash" items, not having a red check mark appeared charged out for that day on appellant's cash book.

■ Respondent states that he is not bound by the entries in respondent's Exhibit O, stressing Snell Isle, Inc., v. Commissioner of Internal Revenue, 5 Cir., 90 F.2d 481, 482 [3]; 32 C.J.S., Evidence, § 1040d, notes 12–14, p. 1114. Respondent's case of Talley. v. Richart, 353 Mo. 912, 185 S.W.2d 23, 26 [4, 8], states the rule about contradicting oral testimony of one's witness is applicable to written exhibits introduced in evidence, and is to the effect that, by offering the exhibit, respondent will not be heard to say the exhibit was not an audit of appellant's account with respondent or that such statements were not made therein; but respondent is not conclusively bound by said statements where other evidence was introduced contradicting the statements. It has been stated the general rule is that the whole of the contents of a written exhibit are in evidence. Sikes v. Riga, 221 Mo.App. 152, 297 S.W. 727, 729 [8]; Landman v. John Hancock Mut. L. Ins. Co., Mo.App., 211 S.W.2d 530, 533 [3]. See also 32 C.J. S., Evidence, §§ 774, 775, pp. 699, 700; 88 C.J.S., Trial, §§ 86, 87, pp. 193, 194; 20 Am.Jur. 771, § 915; Annotation, 17 Ann. Cas. 381.

■ The Snell Isle, Inc., case, supra, involved a ruling of the Commissioner assessing income taxes, which ruling, by statute, was presumed to be correct and placed the burden of proof on the taxpayer. That is not this case. Here respondent alleged want of consideration and fraud, and had the burden of proof on each issue. Section 431.020 RSMo 1949, V.A.M.S.; Smith v. Ohio Millers Mut. Fire Ins. Co., 330 Mo. 236, 49 S.W.2d 42, 45 [3]; Gershon

v. Ashkanazie, 239 Mo.App. 1012, 199 S.W. 2d 38, 46 [5–7]; Troll v. Spencer, 238 Mo. 81, 101, 141 S.W. 855, 861 [8, 9].

The transcript shows that appellant's cotton gin records were offered by appellant and that the referee "considered said records in making my findings." The referee's findings, which did not conform to respondent's evidence or appellant's records, were general in nature and to the effect, in the interest of space, that appellant failed to give respondent credit for cotton and soybeans, or their proceeds, delivered to appellant; that appellant charged many items against respondent which respondent did not owe; that appellant's books were and known to be incorrect by appellant and his employees, and that appellant was indebted to respondent, instead of respondent being indebted to appellant, at the close of each crop year for 1947 through 1950.

If appellant's said ledger account was not in evidence, respondent's Exhibit O was in evidence; because the referee could not have arrived at the findings he made for the several years without considering Lenti's audit, nor could respondent have arrived at the charges and credits shown in recapitulations and other calculations, some are mentioned infra, in his brief without considering said audit. Consult Section 490.680 RSMo 1949, V.A.M.S.; Anchor Milling Co. v. Walsh, 108 Mo. 277, 285, 18 S.W. 904, 906; Hancock v. Crouch, Mo. App., 267 S.W.2d 36, 40 [1–5]; Kansas City Wholesale Groc. Co. v. H. T. Poindexter, etc., Co., 232 Mo.App. 378, 107 S.W.2d 841, 844 [4].

Respondent first transacted business with appellant in 1945. His indebtedness to appellant of $12,672.66 at the end of 1946 is not questioned. Respondent purchased 130 acres of land in Pemiscot county in 1942, borrowing $6,500 from a life insurance company at the time. He valued his farm machinery at $8,000 in 1946. He did not deliver any of his 1951 crops to appellant.

Respondent farmed the same 628 acres in 1947, 1948 and 1950, renting all except his 130 acres from appellant—300 acres at one-fourth of the crop and 198 acres for $2,250, which was raised to $2,500 in 1949. In 1949 he rented an additional 120 acres for one-fourth of the crop from appellant. He testified from memory that his crops were: 291 bales of cotton in 1947; 554 bales of cotton in 1948; 399 bales of cotton in 1949, and in 1950, 135 bales of cotton on 55 acres of his 130 and 132 acres of the 300 acres, and $30,000 worth of soybeans, at, he stated, a charge of $12.50 an acre for appellant's land.

Estimates by defendant's witnesses L. M. Byers and T. A. Haggard, experienced cotton raisers and gin operators, tended to corroborate respondent's evidence of his cotton crops, but neither knew how much cotton respondent actually raised or delivered to appellant. Mr. Byers stated respondent was ginning with him at the time of trial and ginned with him "a little" in 1948, 1949 and 1950. Mr. Haggard's testimony was limited to the cotton raised on respondent's 130 acre home place, and Mr. Byers was speaking of the 130 acre and 300 acre tracts, and recalled seeing the 198 acre tract but one time, which was in 1949.

We understand cotton, with the seeds, is delivered to the scales at the gin, where the load is weighed and the weight noted on a weight ticket with the ginner's name on it, and the producer's name is added. The cotton is sucked into a stall for that producer in the cotton house or ginned. The empty truck is weighed and noted to get the weight of the seed cotton, and the ticket is numbered. The producer or trucker is given the original or a copy of the weight ticket. Two copies go to the office and the weights are entered on a book. When the cotton is ginned the lint cotton and the seed are weighed separately, gin tickets are issued showing these weights, and duplicate entries are entered in a book. The producer receives copies of the gin tickets, which are numbered consecutively through the crop year. The baled cotton carries a bale number and can be traced. There was testimony that if the producer receives the weight on the cotton there is no way for the ginner to "beat" the producer out of his cotton.

When respondent's cotton was sold appellant would deduct from the proceeds the charges against respondent incurred in connection with the raising, processing and marketing of the cotton, and enter the net credit to respondent's account.

We summarize the recapitulations in respondent's brief, based on respondent's memory of his crops:

For 1947: Respondent produced 291 bales of cotton, 119 of which were subject to one-fourth crop rent, a net of 261¼ bales. Based on a price of 32 cents a pound for 500 pound bales and a rebate on seed of $26 a bale ($186), respondent claims a credit of $48,592.50. This credit is subject to deductions for cash rent $2,250, furnishing $15,000, advance for picking $13,095—total deductions $30,345, leaving a balance claimed by respondent of $18,247.50 for the 1947 crop. The referee allowed $10,313.91.

For 1948: Respondent produced 554 bales of cotton, 265 of which were subject to one-fourth crop rent, a net of 487¾ bales. Based on a price of 32½ cents a pound for 500 pound bales and a rebate on seed of $12 a bale ($174.50), respondent claims a credit of $75,991.52. This credit is subject to deductions for cash rent of $2,250, furnishing $22,000, advance for picking $24,930—total deductions $49,180, leaving a balance claimed by respondent of $26,811.52 for the 1948 crop. The referee allowed $8,741.06.

For 1949: Respondent produced 399 bales of cotton, 181 of which were subject to one-fourth crop rent, a net of 342¼ bales. Based on a price of 31 cents a pound for 500 pound bales and a rebate on seed of $5 a bale ($160), respondent claims a credit of $54,740. This credit is subject to deductions for cash rent $2,500, furnishing $24,-000, advance for picking $17,955—total deductions $44,455, leaving a balance claimed by respondent of $10,285 for the 1949 crop. The referee allowed $1,350.30.

For 1950: Respondent states he produced 135 bales of cotton, 85 of which were subject to one-fourth crop rent, a net of 113¾ bales. Based on a price of 40 cents a pound for 500 pound bales and a rebate on seed of $12 a bale ($212), respondent claims a credit of $24,115 for the cotton. In addition, the recapitulation shows respondent claims a credit for soybeans delivered to appellant of $30,678, or a total credit of $54,793. This credit is subject to deductions for cash rent on cotton $2,500, cash rent on soybeans $1,950, furnishing $18,000, advance for picking $6,075—total deductions $28,525, leaving a balance claimed by respondent of $26,268 for the 1950 crop. The referee allowed $19,249.75.

Respondent states witness Byers' testimony that 1,350 pounds of Delta Fine No. 15 seed cotton would make a 500 pound bale of lint cotton, upon which his recapitulations are based, is the only evidence on the subject. Byers also stated that this would vary from season to season and depend on the farmer and other factors. Respondent stated 1,400 pounds of seed cotton would gin a 500 pound bale. Mr. Haggard's testimony was to the effect it was about 1,500 pounds. Some statements in respondent's brief indicate approximately 1,900 pounds was required in some instances. There was other evidence from which it may be inferred that frequently more than 1,500 pounds was required, and that it would take 1,800 to 2,500 pounds of snap cotton, which has hulls and waste, to gin a 500 pound bale.

The price per pound is based on the average price of spot cotton from witnesses Byers and Haggard for the years involved, and the rebate on seed on the testimony of Haggard. It is not based on what respondent's cotton or cotton seed actually brought.

Respondent testified: "Q. Was all of this cotton in 1947 and 1948 all good grade? A. No. Most of it we had to snap in March. Q. How much of it? A. 429 bales I picked with Mexicans in 1948. That was picked cotton. Q. What grade was it? A. I don't know. I never seen no grades on it." He also testified that his 1948 crop was "the best grade cotton I had because the government loan cotton is all low grade" and that 258 bales of his cotton was placed in loan in 1948.

Respondent did not at any time allocate the cotton crop between crop-rent land of appellant and the other land he farmed.

There is testimony by respondent that he did not receive "any proceeds from any of these crops" of 1947, 1948, 1949 and 1950; that all he received from appellant for delivering his crop was the monthly allowance, which started at $150 in 1946 and from 1948 on was $200 a month. Appellant "furnished" respondent many different items, ranging from payments of $5 to the Red Cross, cash, checks for small and large amounts, groceries, seed, fertilizer, up to payments for mules, horses, tractors, trailers and other farm equipment, in amounts up to $3,000 on a transaction. Opposed to the above testimony of respondent are the conceded advancements by appellant to respondent for "furnishing" and "advance for picking" in the recapitulations in his brief, mentioned supra.

Respondent testified he was considered "one of the best farmers in Pemiscot county." He had a fifth grade education. He kept the weight tickets in his head, on his truck bodies, in one kind of a book or another, added them at the end of the season and arrived at the number of bales based on 1,350 pounds of seed cotton to a 500 pound bale of lint cotton. He stated he got some papers relating to the 1947 crop off of appellant's books in connection with a court order for their examination. "Q. This 291 bales in 1947, did you have any records of your own to show how many bales you raised that year? A. No. Nothing only in my head and on the truck bodies. Q. You remember that to be the correct number of bales you raised that year? A. Yes. I don't forget it. I remember it." He remembered he produced 554 bales in 1948 independently of any books—"I didn't have to have no books to remember." He remembered the number of bales of cotton he raised independently of any records. He did not know how to keep and did not have any books. Respondent had 130 acres in cotton in 1946 and his counsel asked him how many bales he had that year. He answered: "I don't know."

Respondent testified he had twenty-one settlement sheets received from appellant covering cotton put in loan; that he had other records or sheets from appellant on cotton and soybeans delivered to appellant for the different years; that he had 15 or 20 boxes of papers with "a pile of stuff" in them, but no one without a good education could get anything out of them; that he had some of the sheets for cotton he delivered to appellant for 1947 through 1950 but some had become misplaced; that the papers in the boxes were the records and receipts and accounting slips he got from appellant; that they were in such a shape Mr. Robinson, his auditor, "couldn't have" audited them; and that he kept most of this in his head.

Robert Farmer, respondent's twenty-three year old son, testified he kept the records on respondent's 1949 picked cotton; that he would go to the scales every night, take the weights, and put the date and weight on his ledger when he arrived home; that they showed 453,206 pounds of seed cotton, which should approximate 335 bales of lint cotton; that the weight slips when this cotton was ginned showed 400,554 pounds, a difference of 52,652 pounds, representing 39 bales of lint cotton; and that he was sure he had all the cotton that was ginned in 1949. He thought there was no loss of weight on picked cotton but did not know. The "snap cotton" was not included. He later testified that neither he nor any of his family ever received a weight ticket from appellant; that: "He wouldn't give it to us." "Q. Did you get a bale ticket when you took cotton up there? A. No. Q. A tag with a wire on it to tie on the bale? A. We got some of that junk." Later he stated they got slips of paper after the truck was unloaded to show how much seed cotton there was. Asked, "Where did you get those weights," he stated he got them off of the "scraps of paper there"; "If you are trying to prove there is a ticket there to all the cotton I have got in the book, you are wrong. Q. Then where did you get that information? A. I told you how he come to get these things. He would bring these always. 13,545 pounds.

I would go to my ledger and put it in there. What become of them, I don't know. What can you prove by something like that?"

Based on the claimed payment to Mexicans of $3.50 per 100 pounds of seed cotton at appellant's scales between September 13 and November 25, 1948, respondent states the total paid was $17,814.08, representing 508,973 pounds of seed cotton which should gin out 377 bales, and he was credited with only 317 bales for the 1948 crop year, a credit shortage of 60 bales, or $10,320. Respondent states the foregoing does not include "cotton picked by a crew of approximately 12 pickers of Robert Farmer," who were paid in cash, and the "snap cotton." Some of the son's crew were "tractor drivers." There was testimony that all gins advanced the picking charge and that the charge varied from season to season and during a season. Again, respondent's calculations are based on 1,350 pounds of seed cotton making a 500 pound bale of lint cotton. We have hereinbefore stated what appears of record in this connection.

There are other calculations in respondent's brief. We understand they are computed upon the assumption 1,350 pounds of seed cotton made a 500 pound bale of lint cotton; or upon the assumption all bales of cotton weighed out 500 pounds; or upon the assumption the cotton brought the average price for spot cotton testified to by witnesses Byers and Haggard; or upon the assumption the rebate for seed was the amount testified to by Haggard, or a combination of several of said assumptions. We do not find any apportionment of the cotton between crop-rent land and other land farmed by respondent of record to support apportionments in respondent's brief. Respondent's conclusions do not purport to be based upon what respondent's cotton and cotton seed actually brought on the market.

■ Respondent states appellant "admitted that there were thousands upon thousands of dollars of checks charged against the defendant which the defendant did not get, *or which the plaintiff had no evidence to support.*" (Emphasis ours.)

Respondent, not appellant, had the burden of proof. The checks offered in evidence are dated in 1947, 1948 and 1949 and, by exhibit number and amount, are: B, $600; C, $418.95; D, $128.87; E, $287.75; F, $125.50; G, $960; H, $487; I, $750; J, $147.70; K, $150; L, $750; M, $300; N, $300. The bank charged each against appellant's account. Respondent's Exhibit O shows a red check mark opposite each entry covering the above exhibits, indicating that appellant's records contained supporting data. Exhibits B through F do not have respondent's name on the back. Appellant did not have personal knowledge of the transactions involving Exhibits B through F, or who got the money. He stated he was nine miles out; that often checks were issued too late to be cashed at the bank and the payee would cash it at the store without endorsing it and it would be run through the cash account. Exhibit G, $960, which appellant did not know about, was stated to be all right and respondent's counsel withdrew the exhibit. Exhibit H, $478, is endorsed "E. L. Farmer." Exhibit I, $750, is endorsed "E. L. Farmer, by wife." Exhibit J is payable to E. L. Farmer, Jr., and is endorsed "E. L. Farmer, Jr., E. L. Farmer." Exhibits K, L, and M are endorsed "E. L. Farmer, E. L. Farmer, Jr." Appellant testified the endorsement on Exhibit H did not look like respondent's signature, but, upon being shown Exhibit I stated the endorsements appeared to have been written by the same person. Appellant did not know who endorsed Exhibits J, K, L and M, but stated the endorsements all appeared to be in the same handwriting. Asked about a cash item of $300 of November 25, 1948, appellant answered it was a check, Exhibit N, to respondent; that the endorsement had been torn but the "E" of the signature appeared thereon and it was his opinion the "E" was in respondent's handwriting. Neither Mrs. Farmer nor E. L. Farmer, Jr., testified. The endorsements, honored by the bank, are not repudiated. The showing does not sustain respondent's stated conclusion.

Respondent questioned appellant about other entries on respondent's Exhibit O.

Appellant testified his bookkeeper made the entries in his books; that the "cash" items were entered in the cash book; that tenants would get cash and up to 1949 he did not have his employees take a voucher on "cash" items. Appellant had knowledge of only a few of the "cash" entries and did not personally know whether respondent received the money or property, stating: "I might explain that on that cash book over there"; but was not requested to do so. Illustrative are: "Cash" entries: $125 (3-14-47); $210 (7-19-47); $325 (10-1-47); $800 (9-18-48); $200 (10-1-48); $620 (10-23-48); $100 (12-18-48); $175 (12-23-48); $50 (12-31-48). All of the foregoing carry a red check mark on Exhibit O, indicating appellant had supporting data therefor.

Asked about some entries between September 18, 1950 and December 2, 1950, "groceries," appellant testified that respondent should have copies of the sales slips; that appellant totaled his sales slips at the end of the month, entered the charge against respondent, and destroyed the slips.

After appellant explained, or produced respondent's voucher or endorsed check, "no contest" was announced on the following: $705.51 (9-3-48); $50 (9-16-48); $112.20 (3-2-49); $150 (7-5-49); $2,000 (5-1-50); $2,000 (6-14-51); $2,000 (6-15-51); $2,487.84 (8-2-47); $2,484.54 (10-26-48); $4,083.40 (11-12-48); $4,775 (11-30-50).

Appellant had no voucher for a $200 cash item (10-8-48), but stated the record indicated it was for picking. Appellant stated a $994.50 item (3-17-49) was for a check he issued to Blytheville Fertilizer Co. for fertilizer for respondent; and $576 (3-8-50) was also for fertilizer respondent wanted and appellant told him to get. Appellant had no written authority for these items.

Jerome Whittle was an experienced cotton weigher and worked in appellant's office assisting Mr. Isaac. He testified that during the time he was with appellant, from September, 1949, through 1952, respondent was credited with all the cotton he brought to appellant's gin and the credit was entered for the cotton, including rebates for the seed, as soon as it was sold; that when respondent asked Mr. Isaac, respondent was given a statement of what he owed, his balance; that each year Isaac gave respondent a statement of his year's business, what he borrowed, what cotton he ginned, his charges and his credits; that respondent never said it was incorrect but would come in later and say it was all right; that with reference to the February, 1950, transactions, developed hereinafter, respondent stated his son had been keeping books and there was only a few dollars difference between his and Isaac's figures.

Aubrey Stinnett, who succeeded Whittle as appellant's bookkeeper, testified that an examination of appellant's books showed respondent delivered to appellant 120 bales of cotton in 1950; 323 bales in 1949; 317 bales in 1948; 186 bales in 1947; a total of 946 bales.

Notwithstanding respondent's testimony that he delivered all of his cotton to appellant, appellant developed that respondent ginned cotton at other gins. Respondent admitted he ginned small quantities of cotton at other gins but stated appellant knew it and received the checks issued in payment. Appellant stated he did not know at the time that respondent was ginning cotton elsewhere and although he received some checks from other ginners he did not know that all such ginning by respondent was covered by the checks he received.

Respondent testified appellant required him to execute a note and mortgage each year; that he would need money to make a crop and in January or February would tell appellant's bookkeeper he "wanted $600 or $1,000, and he would say: 'We had better fix these papers up.' I would say: 'I want a settlement.' The bookkeeper would say: 'Your cotton ain't sold yet.'" Respondent stated: "What would get me balled up, my cotton wasn't settled for." Respondent's cotton was usually sold in the Spring of the years as the market was higher. The cotton was respondent's property until sold and when sold appellant was entitled to apply

the proceeds as a credit on respondent's indebtedness, if any. Appellant testified that at least once each crop year a balance on respondent's account was struck and a note was taken for the balance due and also a note to cover the advancement for furnish for respondent's next crop, and respondent's old notes were surrendered to him.

Respondent's indebtedness to appellant on December 31, 1946, of $12,672.66 is not questioned. Respondent's Exhibit O shows that respondent owed appellant in excess of $44,000, February 28, 1950. Appellant considered he needed additional collateral and, after taking the subject up with respondent, respondent gave appellant a note for $30,000 and secured its payment by a deed of trust, signed by respondent and wife, on respondent's 130 acres. Respondent also gave appellant a note for $24,816.50, the note in suit, $10,000 or a little more of which was for furnish for the 1950 crop. The papers are dated February 28, 1950. Asked: "Q. * * * What did you give him that [$24,816.50] note for? A. For furnish to make a crop and the balance of what I owed him. That is what he said." "Q. You gave him the note for what you owed him at that time and to get money to make a crop in the future? A. That is right." Respondent also testified: "That mortgage included the balance of what I owed him up to date and what I was going to use in the 1950 crop. $54,000 was all of it." "Q. At the time you gave this $24,000 note to Ellis you knew at that time how many bales of cotton you had produced on the land in previous years? A. Yes, sir." "Q. As far as the $54,000 was concerned, the two notes and mortgages and deed of trust you gave him in February, 1950, was correct at that time, if he gave you credit for the balance of the cotton? A. Yes."

September 26, 1951, respondent and his wife deeded the 130 acre farm to appellant in exchange for the $30,000 note and deed of trust.

Respondent testified appellant had not credited him with a bale of his 1949 cotton when the notes and mortgages of February 28, 1950, were executed. Respondent's Exhibit O shows that he had been credited with more than 200 bales of cotton in December, 1949, and January, 1950.

Respondent claims he was given credit for only two bales of cotton after February 17, 1950, whereas he was entitled to a credit of 15 bales. Respondent's Exhibit O shows that respondent was given credit for 15 bales in May, 1950, and an additional credit in June, 1950.

Respondent states appellant admitted he "failed to give Farmer credit for certain soybeans which had been sold by defendant and checks turned over to plaintiff." We fail to find such an admission in the transcript. Respondent testified he sold his 1950 soybean crop to Swift, to Vickery & Storey, and to Hemphill Soybean Products; that he sold the beans for appellant and delivered the proceeds to appellant. He also testified: "When I sell beans, I can sell beans in my own name." "Q. What did that amount to? A. $30,000. The whole thing." He stated appellant never gave him a receipt. He also testified the checks for the soybeans sold to Swift were made out to appellant "and he give me a copy of what he figured they brought." Respondent's Exhibit O shows respondent received credits for "beans" totaling $20,593.36 in 1950, and, in addition, credits for "melons" (which respondent did not mention having raised) of $1,876.25. This totals $22,469.61. Respondent testified appellant did not give him credit for a $1,406.50 check, dated November 24, 1950, from the Hemphill people for beans. Respondent's Exhibit O shows a credit to respondent on November 25, 1950: "Bean credit $1,872.35." On the record, it is reasonable to infer that the $1,406.50 check is included in the $1,872.35 credit.

W. B. Robinson, an accountant, audited appellant's records covering the transactions between appellant and respondent for respondent, but his audit was not in evidence. He thought he was at appellant's in March and also in April, 1952. Respondent states appellant "admitted" he charged against respondent a mortgage that appellant was to pay on the farm respondent

deeded to him in September, 1951. Appellant admitted he assumed this mortgage, and stated the entry had been marked out. Mr. Robinson testified that when he first examined appellant's ledger there was a charge for an insurance check against respondent of $3,881.25, but that when he examined the ledger later it had been circled and the bookkeeper informed him it had been entered in error. The $3,881.25 is not included in the charges against respondent in his Exhibit O.

Respondent states appellant "admitted that he gave defendant credit for only $2,995.50 for the sale of the farm machinery when in fact the machinery brought $7,755.-50." The sale was February 2, 1952. Witness Robinson testified that when he first saw appellant's ledger it showed: "February 4—Credit, Equip. Sale $2,995.50"; and that an additional credit: "February 4, Credit, Equip. Sale $4,760.00" was added later. Respondent's Exhibit O gives respondent a total credit of $7,755.50 on the replevin sale of his farm equipment. Appellant's bookkeeper was of the opinion he made the above two credits in the due course of business in February, 1952. Robinson testified that the two changes (mentioned in the preceding and this paragraph) were the only changes he saw in the account.

Whittle, appellant's bookkeeper, testified he received a statement made out in respondent's name for insurance, paid it, and made the entry "April 7, 1952. W. J. Pollard insurance $200." Appellant's implement company passed statements every month to appellant's bookkeeper, and Whittle, thinking a repair charge thus received was against respondent, entered it, to wit: "2–7–52. Ellis Imp. Co., tractor repairs, $474.79." These entries appear to cover transactions after respondent parted with his title to the property involved. They should not be charged if the transfers be upheld.

■■ Cases stressed by respondent are to the following effect: Fraud may be inferred from surrounding facts and circumstances pointing direct to its existence. Copeland v. American Central Ins. Co., 191 Mo.App. 435, 452, 177 S.W. 820, 825. Contracts or conveyances obtained without sufficient consideration or by fraud and deception may be set aside. Turner v. Turner, 44 Mo. 535, 537; Frederich v. Union Electric L. & P. Co., 336 Mo. 1038, 82 S.W.2d 79, 86 [7–9]; Cobble v. Garrison, Mo., 219 S.W.2d 393, 394 [2–4]. The record in Howard v. Smith, D.C.W.D.Mo., 90 F. Supp. 385, 386, established that the land owner charged capital investments or improvements on his farm as expenses of operation against the tenant.

■ "Fraud is never presumed, except there be facts shown from which it can be inferred. It does not rest on mere suspicion. The precept is that one is not permitted to give weight to smoke, and suspicion is but smoke. He who asserts fraud, as said, must prove fraud. It may be difficult to prove, but that difficulty does not dispense with the necessity of the proof." Troll v. Spencer, 238 Mo. 81, 101, 141 S.W. 855, 861 [8, 9]; Troll v. City of St. Louis, 257 Mo. 626, 657, 658, 168 S.W. 167, 174; Powers v. Shore, Mo., 248 S.W. 2d 1, 5.

There was no final settlement of the accounts between appellant and respondent, but the evidence establishes that a balance was struck each year, subject to being credited with the proceeds thereafter received for respondent's crops. Respondent's $30,000 note of February 28, 1950, was prima facie evidence of respondent's indebtedness to appellant in that amount; and the $24,816.50 note was like evidence of an indebtedness, less the amount representing furnish to be advanced for the 1950 crop, by appellant to respondent, subject to proper credits upon the sale of respondent's 1949 and 1950 crops deposited with or thereafter delivered to appellant.

■ Harley v. Webb, Mo.App., 153 S.W.2d 796, 797 [2], states: "It is the rule that when parties having mutual matters of account between them growing out of a

contract deliberately account together and state a balance, and the party who, in such accounting, is found indebted to the other, pays the debt, or gives a written obligation for its payment, this settlement is so far conclusive between the parties that it cannot be reopened or gone into, either at law or in equity, except on clear proof of fraud or mistake, or of an express understanding that certain matters were left open for future adjustment." See also Caneer v. Kent, 342 Mo. 878, 119 S.W.2d 214, 216 [1, 2]; Kinman v. Cannefax, 34 Mo. 147, 148; Brent v. Westerman, D.C.W.D.Mo., 123 F.Supp. 835, 837 [4]; 15 C.J.S., Compromise and Settlement, § 26, p. 744; 11 Am.Jur. 271, §§ 23, 25.

■ Respondent's testimony that he never agreed to what appellant said he owed is of little weight in view of his execution of the notes, and acceptance of furnish advanced by appellant in 1950 and 1951. Priest v. Oehler, 328 Mo. 590, 41 S.W.2d 783, 788 [8]; Kahn v. Brunswick-Balke-Collender Co., Mo.App., 156 S.W.2d 40, 43 [6]. In addition, he thereafter conveyed his 130 acre farm to appellant in exchange for his $30,000 note and deed of trust in September, 1951. Brent v. Westerman, D.C.W.D.Mo., 123 F.Supp. 835, supra; Pollman & Bros. Coal & Sprinkling Co. v. City of St. Louis, 145 Mo. 651, 659, 47 S.W. 563, 565.

■ Respondent's case is based upon his memory of many transactions, involving different amounts of weight and money over a period of several years, for which businessmen ordinarily make written records to avoid mistakes. Respondent was not a disinterested witness. The record establishes that his memory is not infallible. Oral testimony is not as reliable as written evidence. His testimony is opposed by Whittle, a disinterested witness, that respondent received credit for all the cotton delivered to appellant for the crop years 1949 and 1950. He did not introduce his auditor's report of the examination of appellant's account with respondent. His auditor testified to no improper entry in appellant's records for the crop years 1947 through 1950. Respondent received written acknowledgments covering his delivery of cotton to appellant and of the soybeans he sold to Swift. He had 15 or 20 boxes of papers but introduced none to refute entries on his Exhibit O. He may be able to make out his case; but on the instant record it is not supported by that preponderance essential to overcoming appellant's written account of his transactions with respondent and respondent's written obligations in conformity with said account evidencing his indebtedness to appellant and testimony tending to support the same.

Respondent pleaded in Count V that his 130 acre farm was worth $30,000 and asked judgment for $23,750, the $30,000 less $6,250 furnish thereafter advanced by appellant. The finding was for respondent for $23,750 plus interest. No issue existed with respect to the $30,000, but we are unable to arrive at the $6,250 figure from our study of the record.

■ We find no "point" in appellant's brief attacking the judgment on Count VI, awarding $1,855.76 for the sale of a tractor by respondent to appellant. The judgment on said count is affirmed. Scott v. Missouri Pac. R. Co., 333 Mo. 374, 62 S.W.2d 834, 840 [17, 18]; Berghorn v. Reorganized School Dist. No. 8, 364 Mo. 121, 260 S.W. 2d 573, 580 [5]; Wallace v. Brown, Mo., 165 S.W.2d 408 [1].

■ No "point" is made in appellant's brief covering the finding that the value of the property taken under appellant's replevin writ was $15,640.64. We think respondent is entitled to hold this finding of fact, any judgment in connection therewith to await the outcome of appellant's liability. Section 512.160(3) RSMo 1949, V.A.M.S.; Beckwith v. Standard Oil Co., Mo., 281 S.W.2d 852, 857 [11]; Bobst v. Sons, Mo., 252 S.W.2d 303, 305 [5]; Denny v. Guyton, 327 Mo. 1030, 40 S.W.2d 562, 591 [34].

The judgment is affirmed as to Counts VI and VII of respondent's counterclaims; and in other respects is reversed and the

cause is remanded for further proceedings in accord herewith.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

All concur.